COURT OF APPEALS OF VIRGINIA


Present:  Judges Benton, Elder and Frank
Argued at Chesapeake, Virginia


MARRIOTT INTERNATIONAL, INC. AND
 CONTINENTAL CASUALTY COMPANY
                                          OPINION BY
v.    Record No. 0680-00-1        JUDGE JAMES W. BENTON, JR.
                                          JANUARY 9, 2001
ROBERT D. CARTER, III


          FROM THE VIRGINIA WORKERS' COMPENSATION COMMISSION

          Roger L. Williams (John T. Cornett, Jr.;
          Williams, Lynch & Whitt, on brief), for
          appellants.

          Byron A. Adams for appellee.


     Marriott International, Inc., appeals from the Virginia

Workers' Compensation Commission's award of temporary total

disability benefits and medical benefits to Robert D. Carter,

III.  Marriott contends that Carter's disability was unrelated

to his April 4, 1997 injury by accident and that the medical

treatment provided by physicians other than Carter's treating

physician was unauthorized.  For the reasons that follow, we

affirm the commission's decision.

                              I.

     On appeal, we review the evidence in the light most

favorable to the party prevailing below.  See R.G. Moore Bldg.

Corp. v. Mullins, 10 Va. App. 211, 212, 390 S.E.2d 788, 788

(1990).  So viewed, the evidence at the evidentiary hearing

proved that on April 4, 1997, Carter sustained an injury to his left knee while he was on his knees cleaning a floor. Carter testified that when he leaned back to grab a bucket, he felt a sharp pain in his knee. Marriott, his employer, denied responsibility for Carter's claim.

Carter selected as his treating physician Dr. Thomas Stiles, an orthopedic surgeon, who was listed in his employee handbook. On June 5, 1997, Dr. Stiles performed arthroscopic surgery on Carter's left knee, shaving some chondromalacia from the patella and removing a small flap tear on Carter's lateral meniscus. Dr. Stiles also shaved the fat pad on Carter's knee. Despite this surgical intervention, Carter continued to have pain in his knee. In August 1997, Dr. Stiles noted that Carter had a "rather marked weakness of his left quadriceps." Nevertheless, following a September 22, 1997 examination of Carter's knee, Dr. Stiles released Carter to return to work.

On October 2, 1997, after a fall he attributed to weakness in his knee, Carter went to a hospital emergency room, where he was treated by Dr. Thomas Camp. Dr. Camp's assessment of Carter's condition was that Carter had sustained an "[a]cute exacerbation of a chronic left knee disorder with effusion." Dr. Camp provided Carter with a knee immobilizer and crutches and directed him to follow up with his physician.

Carter testified that he had no income and no other source for paying his medical bills because Marriott had not paid any

-

of his medical bills.  Carter, therefore, obtained treatment through his wife's health insurance plan.  Using her plan, he received treatment from Dr. Virginia Wells, the designated primary care physician for his wife's health insurance plan.  After examining Carter regarding his knee injury, Dr. Wells referred Carter to Dr. Charles Wilhelm, an orthopedist.

Dr. Wilhelm viewed the videotape of the arthroscopic surgery performed by Dr. Stiles and opined that the chondromalacia treated by Dr. Stiles' surgery was probably caused by Carter's April 4, 1997 injury.  Dr. Wilhelm further opined that he did not see any reason why Carter's accident could not have caused the chondromalacia.  He explained that he was "not aware that there is any other contributing cause."  Dr. Wilhelm testified that Carter's complaints of pain seemed out of proportion to the orthopedic manifestations of his injury; however, he further testified that "some people who have terrible softening and mechanical destruction of the joint . . . don't appear to have a lot of pain and then there are other people who don't have much destruction but who appear to have a lot of pain.  It's a very diverse range of symptomatology for people who have that."  Dr. Wilhelm stated that the procedure Dr. Stiles employed "might improve some mechanical symptoms, but would not be expected to alleviate the pain."  He did not assert that Carter was malingering and noted that the atrophying of Carter's quadriceps tended to substantiate Carter's complaints

-

of pain.  Dr. Wilhelm testified that muscle atrophy can result either from injury and disuse or pain syndrome.

During a February 13, 1998 visit, Dr. Wilhelm noticed an absence of quadriceps contraction in Carter's left leg and referred Carter to a neurologist, Dr. Shawke Soueidan.  Dr. Soueidan performed an EMG of Carter's left leg and lower back, the results of which were minimally abnormal.  Based on the results of various tests, Dr. Soueidan concluded that the atrophy was not progressive, but was caused by disuse secondary to Carter's knee pain.  After an August 1998 follow-up visit, Dr. Soueidan noticed, however, progressive atrophy of the quadriceps, coupled with hypoflexia.

On June 11, 1998, Dr. Wilhelm performed arthroscopic surgery because Carter "had persistent left knee pain."  He observed further erosion of the articular surface of the kneecap and "some inflamed . . . lining tissue."  Dr. Wilhelm found nothing that satisfactorily explained the extent of Carter's pain and admitted he was at a loss to explain the cause of the atrophy and hypoflexia.  He described Carter's pain complaints as enigmatic and concluded that Carter "had a pain syndrome, which emanated from a work-related injury without a diagnosis for that ever provided by my intervention."  Dr. Wilhelm explained that he could find no orthopedic explanation for Carter's pain; however, he concluded that Carter was pain-free

prior to the accident and that the pain was caused by the work injury.

Following the hearing, the deputy commissioner ruled that Carter was unable to work as of December 30, 1997, and ordered compensation to be paid to Carter as of that date. The deputy commissioner also ruled, however, that the medical treatments Carter received from Drs. Camp, Wells, Wilhelm, and Soueidan were unauthorized and that Marriott was not responsible for those medical treatments. On review, the commission affirmed those rulings in part and reversed in part. The commission held that Carter was only partially disabled from December 30, 1997 through June 15, 1998 and that he had failed to adequately market his residual work capacity. The commission also held that Carter was totally disabled effective June 16, 1998. Although the commission agreed that Dr. Stiles was Carter's treating physician, the commission applied Code § 65.2-603(C) and found that Carter had established good reason for seeking treatment from Dr. Wilhelm and the other physicians Carter had seen directly or by referral for his work-related injury. Marriott appealed this award.

## II.

"Causation is an essential element which must be proven by [an employee] in order to receive an award of compensation for an injury by accident . . . ." AMP, Inc. v. Ruebush, 10 Va. App. 270, 274, 391 S.E.2d 879, 881 (1990). "The actual

-

determination of causation is a factual finding that will not be disturbed on appeal if there is credible evidence to support the finding." Ingersoll-Rand Co. v. Musick, 7 Va. App. 684, 688, 376 S.E.2d 814, 817 (1989). Moreover, "[w]here reasonable inferences may be drawn from the evidence in support of the commission's factual findings," we will not disturb those findings on appeal. Hawks v. Henrico County Sch. Bd., 7 Va. App. 398, 404, 374 S.E.2d 695, 698 (1988).

A doctor's statement that a certain condition is probably connected to the injury means there is a reasonable likelihood of causation, which "is sufficient to permit a trier of fact to accord the statement probative weight." Cook v. City of Waynesboro Police Dep't, 225 Va. 23, 30, 300 S.E.2d 746, 749 (1983). The commission may also consider "[t]he testimony of [an employee] . . . in determining causation, especially where the medical testimony is inconclusive." Dollar General Store v. Cridlin, 22 Va. App. 171, 176, 468 S.E.2d 152, 154 (1996). In addition, the commission may rely upon circumstantial evidence in finding that an injury was caused by a particular accident. See Van Geuder v. Commonwealth, 192 Va. 548, 557, 65 S.E.2d 565, 570-71 (1951).

Carter testified that his knee pain commenced with the work effort he was engaged in on April 4, 1997 and was never completely relieved by the medical treatment he received. The commission reviewed the medical evidence and found as follows:

-

> Dr. Wilhelm has consistently related the claimant's condition to the work-related incident. Dr. Wilhelm stated that the claimant suffered a pain syndrome that emanated from, and started with, the work-related injury. Similarly, both Dr. Camp and Dr. Soueidan noted the accident, the June 1997 surgery, and subsequent weak knee problems. Significantly, Dr. Stiles found marked left quadriceps weakness on August 25, 1997. No medical report advances a different cause. There is no medical evidence that any treatment was unreasonable or unnecessary.

The medical evidence and the reasonable inferences that flow from this evidence support these findings. "Medical evidence is not necessarily conclusive, but is subject to the commission's consideration and weighing." Hungerford Mech. Corp. v. Hobson, 11 Va. App. 675, 677, 401 S.E.2d 213, 215 (1991). Furthermore, on appeal, we "[do] not retry the facts, reweigh the preponderance of the evidence, or make [our] own determination of the credibility of the witnesses." Wagner Enters., Inc. v. Brooks, 12 Va. App. 890, 894, 407 S.E.2d 32, 35 (1991).

Carter presented credible evidence that sufficiently proved his disabling condition was caused by the April 4, 1997 injury by accident. Accordingly, the commission's finding that Carter's injuries were causally connected to his industrial accident was not plainly wrong.

### III.

Where an employer initially denies that an injury is compensable, the employee is entitled to select a treating

-

physician.  See Bassett Burkeville Veneer v. Slaughter, 21 Va.
App. 575, 578-79, 466 S.E.2d 127, 128-29 (1996).  Once the
employee selects a treating physician, the employee cannot
unilaterally change physicians unless an emergency exists or the
commission approves the change.  See Goodyear Tire & Rubber Co.
v. Pierce, 9 Va. App. 120, 130, 384 S.E.2d 333, 339 (1989).  In
a related vein, Code § 65.2-603(C) provides as follows:

> If in an emergency or on account of the
> employer's failure to provide the medical
> care during the period herein specified, or
> for other good reasons, a physician other
> than provided by the employer is called to
> treat the injured employee, during such
> period, the reasonable cost of such service
> shall be paid by the employer if ordered so
> to do by the Commission.

The record proved and the commission found that Carter
turned to his wife's insurance plan to pay for his medical
treatment.  Her plan required him to use her primary care
physician, who referred Carter to Dr. Wilhelm.  The commission
found that Carter "had good reason to treat with [Drs. Wells,
Camp, and Wilhelm] because [Marriott] had declined to accept the
claim and payment for these physicians would be covered by his
wife's health insurance."  The commission also found that the
treatment was reasonable, necessary and related to his work
injury.  Credible evidence in the record supports these
findings.  Accordingly, we will not disturb the commission's
ruling that Marriott was responsible for the medical treatment
provided by these doctors and their referrals.

-

For the reasons stated above, the decision of the commission is affirmed.

<u>Affirmed.</u>
